IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

HARVEY HOLLAND,                          :
                                         :
                Defendant,               :
                                         :
        v.                               :        1:CR-01-195-06
                                         :
UNITED STATES OF AMERICA,                :
                                         :        **FILED**
                Plaintiff.               :        **HARRISBURG**

                                                  JAN 2 9 2007

                                                  MARY E. D'ANDREA, CLERK
      _____                 Per_____
      **BLAKELY APPLIES RETROACTIVELY**                  DEPUTY CLERK
      _____

        NOW COMES Harvey Holland seeking permission to initiate appellate review
of the district court's order filed December 5, 2005, denying motion to correct
sentence pursuant to 28 U.S.C. §2255.  Hence this court should limit its
examination to a threshold inquiry into the underlying merit of the claim rather
than ruling on the merit.  **Miller-El v. Cockrell**, 153 L.Ed.2d 931.

        Hereinbelow defendant proceeds to demonstrate a substantial showing of the
denial of a constitutional right.  Thus defendant can satisfy this standard by
demonstrating that jurists of reason could (1) disagree with the district court's
resolution of his constitutional claims or (2) conclude the issues presented herein
are adequate to deserve encouragement to proceed further.

        In a habeas corpus proceeding in which the detention complained of arises
out of process by a court an appeal by the applicant for the writ may not proceed
unless a district or a circuit judge issue a certificate  of appealability
pursuant to §2253(c) of Title 28, United States Code.  If an appeal is taken by
the applicant, the district judge who rendered the judgment shall either issue
a certificate of appealability or state the reasons why such a certificate should
not be issued.

The certificate or the statement shall be forwarded to the court of appeals
with the notice of appeal and the file of the proceedings in the district court.
See **Hunter v. U.S.**, 101 F.3d 1565.

## BACKGROUND

Defendant was convicted following jury trial of distribution and possession
with intent to distribute fifty grams or more of crack cocaine in violation of 21
U.S.C. §841(a)(1) and  18 U.S.C. §2 and conspiracy to distribute and possess with
intent to distribute fifty grams or more of crack cocaine.  His conviction and
sentence were affirmed by the  Third Circuit Court of Appeals and soon after the
Supreme Court denied his petition for writ of certiorari on January 12, 2004.

Defendant filed the instant motion to correct judgment and sentence pursuant
to 28 U.S.C. §2255 ¶6(3).  Defendant argued that his sentence violated the dictates
of **Blakely v. Washington**, 124 S.Ct. 2531 (2004).

## THRESHOLD QUESTION

The threshold question presented herein is whether existing precedent in this
circuit answer whether the rule announced in Blakely/Booker applies retroactively?

## DISCUSSION

The Supreme Court has not yet stated whether the rule announced in Blakely
and Booker applies retroactively to cases on collateral review.  The lower court
decisions that the court was reviewing were direct appeals.  Discussion of
retroactivity would have been gratuitous and was not briefed.  Consequently, no
inference can be drawn from the court's failure to discuss that issue.  In
ascertaining whether Booker applies retroactively the first step is to clarify
what rule the court announced a process complicated here by the unusual alignment
of justices the remedy endorsed by five members of the court (which made the
sentencing guidelines advisory) must not be confused with the constitutional
violation at issue.  The constitutional violation was the enhancement of a
sentence above the statutory maximum based upon facts neither admitted by the

2

defendant nor found by a jury to be true beyond a reasonable doubt.  The step in analyzing retroactivity is to determine whether Blakely and Booker announced a new rule.  A case announces a new rule if the result was not dictated by precedent existing at the time the defendant conviction became final.  See **Teague v. Lane**, 489 U.S. 288, 301 (1989).

Defendant's conviction was final in January 12, 2004, way after the decision in **Apprendi v. New Jersey**, 530 U.S. 466 (2000) although Blakely and Booker are extensions of Apprendi the latter's application to the federal sentencing guidelines was not dictated by Apprendi.

Prior to Blakely every circuit that considered the question concluded that Apprendi did not apply to federal sentencing guidelines.  See **United States v. Hernandez Guardado**, 228 F.3d 1017.  Whether Booker was dictated by Blakely presents a closer question.

Defendant's conviction became final before either Booker or Blakley was announced.  Even if Booker were dictated by Blakely; it would still constitute a new rule so far as defendant is concerned.  The next step is to decide whether the new rule is substantive or procedural.  A rule is substantive for the present purpose if it alters the range of conduct or the class of persons the law punishes. Rules that regulate only the manner of determining the defendant's culpability are procedural.  See **Schriro v. Summerlin**, 124 S.Ct. 2519 (2004) applying this definition the rule announced in Blakely and Booker is procedural.

New substantive rules generally apply retroactively because they necessarily carry a significant risk that a defendant stands convicted or an act that the law does not make criminal "or faces a punishment the law cannot impose upon him."  Id. at 2522-23.  New rules of procedure generally are not retroactive they merely raise the possibility that some one convicted with use of the invalidated procedure might have been acquitted otherwise.

Because of this more speculative connection to innocence retroactive effect is given to only a small set of watershed rules of criminal procedure implicating the

3

fundamental fairness and accuracy of the criminal proceeding.  Id. at 2523.

(citations omitted).  It is a prime instrument for reducing the risk of convictions

resting on factual error.  The reasonable doubt standard is indispensable to command

the respect and confidence of the community in applications of the criminal law.

See **lvan V. v. City of New York**, 407 U.S. 203, 205 (1972)(purpose of reasonable doubt

standard is to overcome an aspect of a criminal trial that substantially impairs

the truth finding function and Winship is thus to be given complete retroactive

effect).  **Hankerson v. North Carolina**, 432 U.S. 233 giving retroactive effect to

rule requiring proof of all elements of crime beyond a reasonable doubt and voiding

presumptions that shift burden of proof to defendant.

Winship, Ivan V, and Hankerson predate the retroactivity standard announced in

Teague.  Those decisions also concerned the validity of the underlying conviction

rather than a sentence enhancement.  On the other hand at least five justices have

said that sentence enhancements are of sufficient importance to warrant application

of the reasonable doubt standard in some instances.  See Apprendi, Blakely and

Booker supra.  Given this history this court cannot exclude the possibility that

the Supreme Court might apply Blakely retroactively in some situations.

### DEFENDANT IS ENTITLED TO RELIEF

Under the standard first articulated in Teague the only apparent justification

for retroactive application of Blakely/Booker would be to redress potential

miscarriages of justice resulting from an inaccurate fact finding procedure.  See

Exhibit A, where defense counsel objection is to the probation officer use of the

murder of Jason Harrigan in calculating the guidelines.  Because defense counsel

actually disputed the facts that resulted in the sentence enhancements and the

court decided the matter against him using the wrong standard of proof, he is

entitled to relief because the government sought the court to use the

preponderance of the evidence standard in order to conclude its mandatory to

impose additional point level adjustments which also qualified through relevant

4

conduct find at U.S.S.G. 1B1.3(A)(1)(a) applicable to both counts two and five.

Where it further applied a total office level of "forty-three" (43) criminal

history category of VI which resulted in a guideline sentence of life imprisonment

at (zone D) based on U.S.S.G. chapter 5 part A pursuant to 2K2.4.  See Exhibit B

where the government further advised the court the fact that the jury was unable

to reach a verdict on the court charging the defendant with murder does not

preclude the conduct from being considered by this ruling is totally in opposite

with Supreme Court's Booker finding (unconstitutional).

## CERTIFICATE OF APPEALABILITY SHOULD BE ISSUED

The next question is whether certificate of appealability should be issued

in this case.  Congress has provided that a certificate of appealability may be

issue "only if the applicant has made a substantial showing of denial of a

constitutional right." 28 U.S.C. §2253(c)(2).  The constitutional violation at

issue herein is the enhancement of a sentence above the "statutory maximum" based

upon facts neither admitted by the defendant nor found by a jury to be true beyond

a reasonable doubt.

In the instant case the district court denied defendant motion on procedural

grounds.  However in Slack the Supreme Court held that when the district court

denies a habeas petition on procedural grounds with out reaching the prisoners

underlying constitutional claim, a certificate of appealability should be issued

when the prisoner shows "like here" at least that jurists of reason would find

it debatable whether the district court was correct in its procedural ruling.

**Slack**, 529 U.S. at 484.  The United States Supreme Court has recognized a new

right through Blakely/Booker and defendant has filed his claim based upon that

right within the one year limitation period of 28 U.S.C. §2255 ¶6(3).  As a

result the claim is timely and appropriate filed.

Hence it should be noted that the district court established defendant "life

sentence" under the mandatory sentencing guidelines that the Supreme Court declared

unconstitutional.

The Supreme Court in Booker severed and excised the provisions of the federal sentencing statute that made the guidelines mandatory. See Booker as modified the federal Sentencing Reform Act of 1984 makes the guidelines effectively advisory a dramatic change from the past 18 years. The Booker rule then is that the binding federal guideline system is unconstitutional. That means defendant who was sentenced under that binding system was unconstitutionally sentenced. To be constitutional the sentence would have had to recognize that the guidelines were "advisory" only. The district court in this case considered the guidelines mandatory. Thus it cannot be said that defendant claim regarding enhancing his sentence above the statutory maximum based upon facts neither admitted by him nor found by a jury to be true beyond a reasonable doubt is not debatable among jurists of reason.

Therefore as the record fully and properly reflect sufficient indicia warranting objections which under ordinary prudential doctrines and standard will cause said illegal enhancement errors to be preserved especially where they were also argued in the district court. Movant seek this court to render sentence unconstitutional and appoint counsel so that the matter could be fully presented to the court for consideration of movant appeal by applying Blakely retroactively to defendant's case.

Respectfully submitted,

By: _Harvey Holland_
      Harvey Holland, pro se
      Reg. No. EP8162
      SCI Dallas
      1000 Follies Road
      Dallas, PA 18612

## CERTIFICATE OF SERVICE

I Harvey Holland hereby certify that a true and accurate copy of the foregoing notice of appeal and incorporated attached application for certificate of appealibility has been served on all interested person via U.S. mail postage prepaid to ensure the delivery of same as follows:

>               William A. Behe (A.U.S.A.)
>               Federal Building 228 Walnut Street
>               Harrisburg, PA 17108

>               _Harvey Holland_
>               Harvey Holland, pro se
>               Reg. No. EP8162
>               SCI Dallas
>               1000 Follies Road
>               Dallas, PA 18612

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :
                                  :
                    v.            :    1:01-CR-195-06
HARVEY HOLLAND,                   :
                    Defendant     :


TRANSCRIPT OF PROCEEDINGS

SENTENCING


BEFORE:  HON. WILLIAM W. CALDWELL, Judge

DATE:    November 20, 2002

PLACE:   Courtroom Number Three
         Federal Building
         Harrisburg, Pennsylvania


COUNSEL PRESENT:
WILLIAM A. BEHE, Assistant United State Attorney
    For - United States of America

DENNIS E. BOYLE, Esquire
    For - Defendant


Vicki L. Fox, RMR
Official Reporter

Holland - Sentencing

2

1      THE COURT:  Good morning.

2      MR. BEHE:  Good morning, Your Honor.  The next

3  matter before you is that of the United States of America vs.

4  Harvey Holland which is at Criminal Docket Number 01-195-06.

5  Mr. Holland is present in court with counsel Mr. Boyle.

6      This is the time and place set by the Court for

7  sentencing in this matter.  There has been a presentence

8  investigation report that has been prepared, an objection

9  filed by Mr. Boyle and an addendum prepared by Mr. Vought of

10  the Probation Office addressing the same.

11      We are prepared to proceed at this time.

12      THE COURT:  All right.  We will address first the

13  objections to the presentence report.  Mr. Boyle?

14      MR. BOYLE:  Your Honor, my primary objection to

15  the presentence report concerns the inclusion of the homicide

16  or the death of Jason Harrigan into the sentencing

17  calculations.

18      As the Court is aware, the jury was unable to come

19  to a verdict with respect to that death and whether or not it

20  was a homicide.  We don't exactly know why that was.  But

21  subsequently, the jury was unable to determine guilt, and the

22  government subsequently dismissed that count of the

23  indictment.

24      I understand, Your Honor, that the Court is free

25  in its discretion viewing the evidence to make a

3

Holland - Sentencing

1   determination as to whether or not by a preponderance of the

2   evidence that Mr. Holland was involved in the homicide.

3   However, we believe the evidence shows that he was not, Your

4   Honor.

5           We believe this evidence shows that Mr. Harvey

6   Holland was at most a passer, a rider along or somebody who

7   traveled with his brother.  Obviously, he did use crack

8   cocaine from time to time, but we don't think there is any

9   evidence or sufficient evidence to prove by a preponderance

10  of the evidence that he engaged in this homicide.

11          We further believe, Your Honor, that this homicide

12  was not -- the evidence would indicate this homicide was not

13  drug related in any event.  If in fact Jeffrey Holland was

14  involved in the homicide, it appears as though he may have

15  had motives other than drug use.

16          For example as I recall the evidence, he was

17  offended by this other drug dealer.  This other drug dealer

18  had threatened him and had embarrassed him out on the

19  street.

20          Therefore, we believe that if Jeffrey Holland was

21  involved in the homicide, it was as a result of personal

22  feelings or personal emotions as opposed to drug trafficking

23  itself.  But further than that, we don't think there is

24  sufficient evidence to connect Harvey Holland to the

25  homicide.

4

Holland - Sentencing

1          THE COURT:  All right.  Mr. Behe, do you wish to

2     respond?

3          MR. BEHE:  Yes, Your Honor.  I believe that the

4     evidence in this matter that was presented to the jury far

5     surpassed the preponderance of the evidence standard.  I

6     think it was proved beyond a reasonable doubt that

7     Mr. Holland, Mr. Anderson and Jeffrey Holland were involved

8     in the ambush murder of Jason Harrigan.

9          Juries do what they do and decide what they decide

10    and don't decide what they don't decide.  I always accept

11    their decisions or lack of decisions.  But regardless of

12    that, at this point, Your Honor is uniquely in a position to

13    decide whether or not the evidence was sufficient to include

14    the homicide as part of a sentencing factor having witnessed

15    or observed all of the witnesses that the United States

16    presented in this particular case.

17         The evidence, as Your Honor concluded at the

18    Jeffrey Holland sentencing, was compelling with regards to

19    the involvement of these individuals in that murder.

20    Numerous individuals testified as to admissions made by one,

21    all or some of the participants in this conspiracy to

22    participating in this homicide, explaining through the

23    admissions made by the various participants details that only

24    those who participated in the killing could have known.

25         The physical evidence at the scene belies any

Holland - Sentencing

1    claim that Mr. Holland was not a participant.  There were

2    three different shell casings from three different caliber

3    weapons which the expert from the Pennsylvania State Police

4    testified would have had to come from three different guns.

5          Evidence presented through the testimony of

6    witnesses who knew of these conspirators placed guns of the

7    same caliber in their hands at various times during the drug

8    trafficking conspiracy.  The jury concluded that Mr. Holland

9    was a coconspirator by its verdict in this case.  The amount

10   of crack cocaine was as the Probation Department determined.

11         I really think there is no colorable argument that

12   this was not a drug related killing as Your Honor so

13   concluded in the Jeffrey Holland sentencing.  There were

14   admissions made by Mr. Holland that Harrigan was messing --

15         THE COURT:  Which Mr. Holland?

16         MR. BEHE:  Jeffrey Holland.  Sorry, by Jeffrey

17   Holland that Mr. Harrigan was messing with the drug

18   business.  Those were statements made to Toyann Anderson.

19   There were statements made my Harvey Holland that he had just

20   come from Camelot Village where he shot someone.  As I said,

21   I think the evidence was compelling that this was a drug

22   related killing and that Mr. Harvey Holland was an equal

23   participant in this killing as well, and that that

24   enhancement should apply.

25         THE COURT:  What quantity of crack cocaine did we

6

Holland - Sentencing

1    talk about in this case?

2         MR. BEHE:  The jury returned a verdict that it was

3    in excess of fifty grams.  That would place this at a

4    mandatory ten to life absent anything else.  But the quantity

5    of crack cocaine from the various witnesses places it

6    conservatively at at least one half of a kilogram up to a

7    kilogram and a half of crack cocaine that was involved in the

8    conspiracy.

9         THE COURT:  That would be what?

10        MR. BEHE:  Five hundred grams to one and a half

11   kilograms.

12        THE COURT:  Mr. Boyle, do you want to respond to

13   anything that Mr. Behe just said?

14        MR. BOYLE:  Yes.  Of course, my recollection of

15   the evidence may be faulty, and I will certainly rely upon

16   the Court's.  I don't recall any admissions made by Harvey

17   Holland with respect to the homicide.  I remember a number of

18   admissions made by Jeffrey Holland.  However, I don't

19   remember any specific admissions by Harvey Holland.

20        MR. BEHE:  Just referring to the presentence

21   investigation report, the information that is contained under

22   the relevant conduct section has that there was in paragraph

23   17, Angela Jackson was interviewed and testified in court

24   Harvey Holland showed up to meet her on one occasion.  When

25   he was late, she asked where he was.  He said I was taking

6

Holland - Sentencing

1    talk about in this case?

2                MR. BEHE:  The jury returned a verdict that it was

3    in excess of fifty grams.  That would place this at a

4    mandatory ten to life absent anything else.  But the quantity

5    of crack cocaine from the various witnesses places it

6    conservatively at at least one half of a kilogram up to a

7    kilogram and a half of crack cocaine that was involved in the

8    conspiracy.

9                THE COURT:  That would be what?

10               MR. BEHE:  Five hundred grams to one and a half

11   kilograms.

12               THE COURT:  Mr. Boyle, do you want to respond to

13   anything that Mr. Behe just said?

14               MR. BOYLE:  Yes.  Of course, my recollection of

15   *the evidence may be faulty* and I will certainly rely upon* *

16   *the Court's.* I don't recall any admissions made by Harvey

17   Holland with respect to the homicide.  I remember a number of

18   admissions made by Jeffrey Holland.  However, I don't

19   remember any specific admissions by Harvey Holland.

20               MR. BEHE:  Just referring to the presentence

21   investigation report, the information that is contained under

22   the relevant conduct section has that there was in paragraph

23   17, Angela Jackson was interviewed and testified in court

24   Harvey Holland showed up to meet her on one occasion.  When

25   he was late, she asked where he was.  He said I was taking

7

Holland - Sentencing

1    care of business out at Camelot Village.  She questioned him

2    further, and he told her that he had killed someone.

3              There was other admissions made by the

4    coconspirators as to who the participants were.  These were

5    statements that we suggest are reliable and can be considered

6    by the Court, along with the physical evidence at the scene.

7              THE COURT:  I had the unique advantage I guess of

8    hearing all of the evidence in this case.  Normally that

9    doesn't happen, particularly when you are dealing with guilty

10   pleas.  But I heard and saw and observed all of the witnesses

11   in this case.

12             I frankly could not understand in any way how the

13   jury failed to return a guilty verdict because in my mind,

14   the evidence against all three of the people who were

15   involved in this was compelling.

16             As I did in the Jeffrey Holland case, I am going

17   to just briefly outline the evidence that is directly related

18   to Harvey Holland.  But I also note, as Mr. Behe has, that

19   many of the things that Jeffrey Holland said to other people

20   or did as a conspirator are admissible and can be considered

21   against Harvey.  And I am not going to outline all of that

22   evidence.

23             Anthony Braxton in paragraph seven of the

24   presentence report, and I recall it from the trial, indicated

25   that the defendant and his brother bragged about shooting an

8

Holland - Sentencing

1    individual named Stewart who apparently was shot in a phone

2    booth near the time when this killing occurred.  I am not

3    saying that that is evidence that either of the gentlemen

4    were involved in shooting Harrigan, but I think it is

5    evidence that can be considered with all of the other

6    evidence as to whether or not Mr. Harvey Holland was involved

7    in this killing.

8           Mark Hughes testified that the defendant and his

9    brother Jeffrey sold crack since 1986, and that he went to

10   New York City to buy crack.  Sometime in the winter of 2000,

11   Mr. Hughes said that the defendant and his brother robbed and

12   shot another dealer.  I don't know if that would be Stewart

13   or not.  Mr. Behe, do you know who that was?

14          MR. BEHE:  I believe that was supposed to have

15   been Ernie Stewart.

16          THE COURT:  I think Mr. Hughes indicated that he

17   observed the defendant in the car -- in a car at one time

18   with a weapon, and that he was always in possession of a

19   weapon and told Mr. Hughes about the shooting of Mr. Stewart

20   in the phone booth.

21          Jamine Jackson said that the defendant was a

22   violent person with a reputation as an enforcer.  Sharonda

23   Posey testified she traveled to New York with the defendant

24   to get drugs.  Angela Jackson, as Mr. Behe has indicated,

25   testified that he admitted at one time or told her at one

Holland - Sentencing

1   time that he was taking care of business in Camelot Village

2   and admitted that he had killed someone.

3          Toyann Anderson said that the defendant implicated

4   himself in the murder with Shawn Anderson and Jeffrey

5   Holland.  I think I have that correct.

6          MR. BEHE:  Yes, sir.

7          THE COURT:  Anthony Jackson said that Jeffrey

8   implicated the defendant Harvey and Shawn, and that Harvey

9   admitted to Jackson that he and Jeffrey shot Harrigan.

10          Sharonda Posey said that the defendant Jeffrey

11   Holland and Shawn Anderson were excited waiting for a TV news

12   report of Mr. Harrigan's death, and that when it came on,

13   things were said like here it is and that nigger is dead, and

14   he got what he deserved, things of that kind.

15          Jeffrey later told Sharonda Posey that he and

16   Harvey and Anderson did it.  And Anderson I think also

17   admitted to killing to Sharonda Posey.  Ezerell Bynum, the

18   three of them told him that they killed Harrigan.  Jeffrey

19   told him that they cut a hole in a gate or a fence and waited

20   to ambush the victim.  And, of course, there was evidence to

21   that effect.  I thought that was significant because how else

22   would Mr. Bynum have that information?

23          Aaron Pitts, another witness, testified that

24   Jeffrey told him why and how he and others used three

25   different guns to kill Harrigan.  And, of course, that

Holland - Sentencing

1   evidence of the use of three weapons Mr. Behe has alluded

2   to.

3           Omar Dykes, who did not testify, told agents that

4   Jeffrey admitted to him that the three people involved here

5   did that -- did the killing, and that the defendant told

6   Dykes to tell Jeffrey not to run his mouth about the

7   killing.

8           I think all of these facts when put together more

9   than persuade me beyond a reasonable doubt, certainly by a

10  preponderance of the evidence that Harvey Holland was a

11  participant in drug dealing, and that he and his brother

12  conspired with Anderson and agreed to seek revenge or

13  whatever it was against Mr. Harrigan.

14          I think it is true that Jeffrey Holland was the

15  boss of this conspiracy so to speak, but all of the

16  conspirators were involved in this killing.  I have no

17  trouble coming to the conclusion that this relevant conduct

18  must be considered in imposing sentence.

19          All right.  Will you have Mr. Holland come up,

20  please?  Mr. Holland, before sentence is imposed, do you have

21  anything that you would like to say this morning concerning

22  the matter of sentencing?

23          THE DEFENDANT:  Yes.  As far as Jason Harrigan, I

24  do not know that young man.  I got kids of my own that is

25  about that young man's age.  I wasn't no more than a crack

11

Holland - Sentencing

1    user.  They're trying to make me out to be something like a

2    big drug dealer.  And in looking at my record and my

3    background, it shows that I was no more than an actual crack

4    user, a person that goes out and does burglaries and commits

5    other offenses like writing checks.  That is not an offense

6    of a drug dealer, of the type of person who is actually

7    bringing drugs into the state of Pennsylvania.

8            Looking at my jacket, I got ten counts of

9    burglaries that I actually got locked up for and presently,

10   recently checks.  Looking at my jacket, that is what it shows

11   is a person who has got a problem.

12           I never laid eyes on Mr. Harrigan.  I never had a

13   problem with Mr. Harrigan.  As far as anyone saying I killed

14   that man, I got a son that is 22 years old and a daughter

15   that's 19 years old.  As far as me being out there being in

16   the type of life that my brother was living in, I was trying

17   to tell him not to sell drugs.  He choose to steal drugs.  I

18   was a user.  It made my activities for me to go out and break

19   into people's stuff and write checks.

20           As far as me per se participating in any of this,

21   I am not guilty of that.

22           THE COURT:  The jury found you --

23           THE DEFENDANT:  The jury never heard all of the

24   evidence.  Where's the evidence that put me with this?  A lot

25   of there times when they say I was selling drugs, I --

Holland - Sentencing

1    THE COURT:  We are past that point, Mr. Holland.

2    Certainly, based upon your past criminal record, it's not

3    difficult for me to believe that you were participating with

4    your brother and Anderson in drug distribution in this

5    community.

6    Do you have anything further you want to say,

7    Mr. Boyle?

8    MR. BOYLE:  Your Honor, I understand we are facing

9    a mandatory minimum sentence here of life.  In view of that,

10   I believe I have already said everything that can be said in

11   the case.

12   THE COURT:  Mr. Behe, do you wish to say anything

13   further?

14   MR. BEHE:  No, Your Honor.

15   THE COURT:  Pursuant to the Sentencing Reform Act

16   of 1984, it is the judgment of the Court that the defendant

17   Harvey Holland is hereby committed to the custody of the

18   Bureau of Prisons to be imprisoned for a term of life.

19   This term consists of terms of life on each of

20   Counts 2 and 5 to be served concurrently with each other and

21   consecutive to the sentences imposed in the Dauphin County

22   Court to numbers 3221-00, 3222-00 and 1964-01, 1971-01, and

23   1963-01.

24   We find that the defendant will have some ability

25   to pay a fine.  Accordingly, we order that he pay the United

Holland — Sentencing

1  States the sum of $4200.00 consisting of a fine of $2,000.00

2  and a special assessment of $100.00 on each count.

3          The fine and special assessment shall be paid

4  through the Clerk of Court, are due in full immediately and

5  are payable during the period of incarceration.  If for some

6  unforeseen circumstances the defendant is released from

7  prison, he shall be placed on supervised release for a term

8  of five years consisting of terms of five years on each of

9  Counts 2 and 5 to be served concurrently.

10          If released from custody of the Bureau of Prisons,

11  the defendant shall report in person within three days to the

12  Probation Office in the district to which he is released.

13  And while on supervised release, he shall comply with the

14  standard conditions that have been adopted by this Court.

15          Mr. Holland, I take no pleasure in imposing a

16  sentence like this, but this is a sentence that is clearly

17  called for under the law.

18          I now want to advise you that you do have a right

19  to appeal your sentence to the United States Court of

20  Appeals.  If you are unable to pay the cost of an appeal you

21  may apply for leave to appeal informa pauperis.  If approved,

22  counsel will be appointed for you, and you will not be

23  required to pay any cost.  Any such appeal must be filed

24  within ten days of today's date.

25          Do you understand that right of appeal,

Holland - Sentencing

1    Mr. Holland?

2              THE DEFENDANT:  Yes, sir, Your Honor.

3              THE COURT:  We are going to dismiss the original

4    indictment and the superseding indictment.

5              MR. BEHE:  Yes, sir.

6              THE COURT:  Is there anything else to be

7    dismissed?

8              MR. BEHE:  No, Your Honor.

9              THE COURT:  Is there anything further?

10             MR. BEHE:  Not in this case, Your Honor.

11             THE COURT:  Thank you.

12             THE DEFENDANT:  Can I appeal this?  You said I can

13    appeal in ten days; right?

14             THE COURT:  Mr. Boyle will talk to you about

15    that.

16             MR. BOYLE:  We have talked about that, Your Honor.

17             THE COURT:  You will file an appeal.  I think that

18    the case should be appealed so that someone else can look at

19    it and pass judgment on it.

20             MR. BOYLE:  Thank you, Your Honor.

21             THE DEFENDANT:  Thank you, Your Honor.

22

23

24

25

1          I hereby certify that the proceedings and evidence

2    are contained fully and accurately in the notes taken by me

3    on the trial of the above cause, and that this copy is a

4    correct transcript of the same.

5

6                              *Vicki A. Fox, RMR*

7                              Vicki L. Fox, RMR

8                              Official Reporter

9

10         The foregoing certification of this transcript

11   does not apply to any reproduction by any means unless under

12   the direct control and/or supervision of the certifying

13   reporter.

14

15

16

17

18

19

20

21

22

23

24

25

ADDENDUM TO THE PRESENTENCE REPORT

United States District Court For The Middle District of Pennsylvania
United States v. Jeffrey Holland, Dkt. No. 1:CR-01-192-02

OBJECTIONS

By the Government

None.

By the Defendant

Defense counsel's only objection (attached) is to the probation officer's use of the murder of Jason Harrigan in calculating the guidelines.

In summary, counsel says that no weapons were ever recovered, there was no physical evidence linking the defendant to the shooting and the jury was unable to reach a verdict on the count charging the defendant with homicide. Counsel notes that there were individuals other than Mr. Holland and his coconspirators who had previous disagreements with Jason Harrigan. The defendant offers that investigative reports disclose that a resident of Camelot Village saw an unidentified white man running from the area immediately after the shots were heard. He notes that a taxi driver reported that she saw two black males in their early twenties in the vicinity of Camelot Village after the murder, they flagged her down, and she noticed that one of them was holding something in the front pouch of his sweatshirt. Counsel notes that with the exception of Toyann Anderson, the witnesses who implicated Mr. Holland in the homicide had extensive criminal backgrounds, were incarcerated at the time of their testimony, and had plea agreements with the Government which could substantially reduce their potential sentence in pending prosecutions against them. Counsel submits that even if the testimony from the various witnesses is somehow deemed sufficient to establish Mr. Holland's involvement in the killing by a preponderance of the evidence, it must further be established that the killing was carried out in furtherance of the drug conspiracy. Counsel believes that if the killing was done for some personal motive or some other disagreement, it would not comprise relevant conduct for purposes of sentencing. Counsel submits that there is very little evidence regarding the reason for the homicide and that the evidence proffered, specifically that of Toyann Anderson, is not sufficient to establish the homicide as one carried out in furtherance of the drug conspiracy.

The probation officer stands by the presentence report and trial testimony and witness interviews which consistently reveal that Mr. Holland, Harvey Holland and Shawn Anderson, by a preponderance of the evidence, killed Jason Harrigan. The fact that the jury was unable to reach a verdict on the count charging the defendant with homicide does not preclude the conduct from being considered by the Court for sentencing as it is relevant conduct under USSG § 1B1.3(a)(1)(A). The evidence seems convincing that Mr. Holland and the others killed Mr. Harrigan. Nine individuals either testified or told agents of conversations they had with Mr. Holland and/or Harvey Holland and Shawn

Anderson concerning their involvement in the murder.
These individuals link the killing with drug trafficking and the
drug conspiracy. The killing took place during the time frame
charged in the drug conspiracy count (V). Toyann Anderson
testified that she pointedly asked Mr. Holland and Shawn Anderson
if they had done the shooting, to which they replied
affirmatively and reiterated, "Yeah, we had to take care of that
nigger because he was talking about getting our profits." Ms.
Anderson said that the "profits" were from drug sales. Anthony
Braxton told investigators that Holland had an ongoing dispute
with another drug dealer from New York known as "J" (Harrigan).
Ezerrell Bynum told investigators that Jeffrey Holland related to
him how he had tried to work out an arrangement with Jason
Harrigan regarding the sale of drugs and the sharing of assets in
business. Bynum recalled Holland telling him that Harrigan
essentially told him that he wanted no part of it. Omar Dykes
told investigators that he recalled Holland telling him that he
had a falling out with Harrigan over a drug debt.

Should the Court find for the defendant, the guidelines would be
calculated pursuant to USSG § 2D1.1 and result in a base offense
level of thirty-eight because the amount of crack cocaine is one
and one-half kilograms or more. Toyann Anderson recalled that
for several months until October 2000, she saw Mr. Holland and
Shawn Anderson cut large pieces of crack cocaine into smaller
pieces for resale on at least twelve occasions and estimated that
they would package several ounces of crack cocaine at a time. At
least three ounces of crack cocaine on each of twelve occasions
equals 1,020.60 grams.

* Jody Covington was in New York in January 2001 with the defendant
and others when they bought a "baseball size" quantity of crack
cocaine.

* Mark Hughes testified that he went to New York with the defendant
three times to get crack cocaine. He said that on each of two
occasions the defendant got one-half kilogram quantities of
crack, and on the last occasion bought four ounces for a total of
approximately 1,113.4 grams.

* The testimony of Wayne Williams alone establishes the defendant's
involvement with one and one-half kilograms or more. He said
that he helped the defendant and Shawn Anderson bag up crack
cocaine between fifteen and twenty times and recalled that they
bagged about seven ounces each time. Seven ounces on at least
fifteen occasions equals 2,976.75 grams.

Adding two levels for obstruction of justice would result in a
total offense level of forty and a guideline range of 360 months
- Life imprisonment.

RESPECTFULLY SUBMITTED,

*John K. Vought*
John K. Vought
Senior U.S. Probation Officer

Approved:

*Edward J. Kosheba*    9/27/02
Edward J. Kosheba              Date
Deputy Chief U.S. Probation Officer

TURNER AND O'CONNELL
ATTORNEYS AT LAW
4415 NORTH FRONT STREET
HARRISBURG, PA 17110

JAMES H. TURNER
TIMOTHY J. O'CONNELL

TELEPHONE
717-232-4551

FAX
717-232-2115

September 25, 2002

John K Vought
U.S. Probation Officer
United States District Court
P.O. Box 805
Harrisburg, PA 17108



RE:    USA v. Jeffrey Holland
       No. 1:CR-01-195-02

Dear Mr. Vought:

        The defendant submits the following in support of his objection to inclusion of the
Jason Harrigan homicide as relevant conduct under U.S.S.G. Section 2D1.1(d)(1):  No
weapons used were ever recovered and no physical evidence linking the defendant to the
shooting was found.  The jury was unable to reach a verdict on the count charging the
defendants with the homicide and the charge was subsequently dismissed upon motion of
the United States Attorney.

        Police reports compiled during the investigation of the homicide by the
Susquehanna Township Police Department disclose the names of individuals other than
the charged defendants who had previous disagreements with the decedent Harrigan.  A
friend of Harrigan by the name of Eugene McDonald stated that Harrigan had a "major
problem" with two men named "Nitty" (Frankie Gordon) and "Jabar" (Robert Baylor).
Harrigan told McDonald Harrigan had exchanged words with Nitty at Roebucks bar and
then it turned into a fistfight.  The following day both were again at Roebucks and the
fight resumed.  Outside the bar, Jabar, a friend of Nitty, pulled a gun and shot Black, a
friend of Harrigan's, in the shoulder.  After that, a number of shots were fired, according
to McDonald.  McDonald reported that he thought the grudge was still outstanding at the
time of Harrigan's murder.

        The reports further disclose that the decedent's girlfriend, cousin and other friends
referred to a person by the name of "James" who was believed to be a rival drug dealer on
the hill who "had it out" for Harrigan.  The identify of "James" was never determined.

John K. Vought
September 25, 2002
Page 2

On the evening of the murder, the reports also disclose that a resident of Camelot Village saw an unidentified white man running from the area immediately after the shots were heard. A taxi driver reported that shortly after the time of the homicide, she saw two black males in their early twenties in the vicinity of Camelot Village. They flagged her. She said one of the individuals seemed to be holding something in the front pouch of his sweatshirt. She gave the other individual a ride to a location on Walker Mill Road but not specifically in front of any residence. The cab driver said it was against policy to pick up individuals in this manner and that they made her very nervous. The identity of these individuals was never determined.

The witnesses who implicated the defendant in the homicide testified that the defendant made admissions that he had been involved. With one exception, the witnesses who testified to alleged admissions made by the defendant had extensive criminal backgrounds, were incarcerated at the time of their testimony, and had plea agreements with the government which could substantially reduce their potential sentence in pending prosecutions against them. The one exception, Toyanne Anderson, was the sister of one of the defendants and was involved in transporting and storing drugs for the defendants. She was never charged for her admitted involvement in the activities. She testified at trial that while she was in the back seat of an automobile driven by Shawn Anderson, the defendants admitted killing the decedent, Jason Harrigan, because of "some kind of drug conflict." Anderson had earlier given a statement to Detective James Heilig and S.A. Dan Craft that the killing followed an incident at Roebucks Tavern in Harrisburg. According to Ms. Anderson, Shawn Anderson had approached Harrigan's girlfriend (who was also in the shooting) not knowing that she was with Harrigan and a confrontation occurred. Ms. Anderson said Harrigan got "all up into Shawn's face" and following this episode the defendants followed Harrigan out to Camelot Village and "shot the guy." She testified that in another conversation "they had to pull out on that nigger because he wanted their profits." Statement (4-3-01 page 4). Tanika Bland, the decedent's girlfriend, testified in some detail at trial of the activities of the decedent and herself the evening of the homicide. At no time did she make any reference to Roebucks Tavern or any confrontation with the defendants. If such a confrontation did not occur, it raises a question as to Toyanne Anderson's accuracy as a witness. If such a confrontation occurred and if it was a motivating factor for the homicide, it raises a question as to whether the killing was drug related at all. It should also be pointed out that in this same statement Ms. Anderson described Shironda Posey as the "mastermind" of the alleged drug business conducted by the defendants. This contention was not supported by any other evidence in the government's case.

Anthony Braxton testified as to an admission allegedly made by Jeffrey Holland regarding the Harrigan homicide. (P.S.R. para. 34). Braxton was charged in the original indictment with Jeffrey Holland, Shironda Posey, Shawn Anderson and Rebekah

John K. Vought
September 25, 2002
Page 3

Christopher.  If convicted, Braxton would have qualified as a career offender.  In return
for his promise of cooperation, he was allowed to plead to a two-count information
charging interstate travel in aid of drug trafficking carrying a maximum sentence of ten
years.  The plea agreement further provided for a potential 5K1.1 departure for
substantial assistance.

 Shironda Posey testified as to alleged admissions made by Jeffrey Holland.
Posey, who was also charged in the original indictment with Jeffrey Holland, was
permitted, in return for her cooperation, to plead to a one-count indictment charging the
use of a telephone to facilitate a drug offense.  This offense carries a four-year maximum
penalty.  The plea agreement also provided for a downward departure under 5K1.1 for
substantial assistance.

Ezerell Bynum, aka Waleed Thomas, testified as to alleged admissions made by
the defendant and his co-defendants on an occasion he was in Harrisburg for a
"PennDOT issue."  Bynum had an extensive criminal record including arson, kidnapping,
receiving stolen property and controlled substance convictions.  At the time of his
testimony, Bynum was awaiting sentence on the charge of uttering fictitious financial
instruments.  He testified pursuant to a plea agreement providing for a 5K1.1 departure
for substantial assistance.  He admitted on cross examination that the "PennDOT issue"
which brought him to Harrisburg was the procurement of a false identification card under
the name of his cousin Waleed Thomas to assist him in avoiding arrest in the event he
was stopped for an arrest warrant he knew was outstanding.

Aaron Pitts testified to alleged admissions made by the defendant about the
homicide while the two were housed in Dauphin County Prison.  (P.S.R. para. 39).  Pitts
had previously plead guilty pursuant to a plea agreement putting a cap on his potential
sentence for distribution of a controlled substance.  He would have otherwise been
exposed to a sentence as a career offender.  The agreement also provided for a 5K1.1
departure for substantial assistance.

Omar Dykes did not testify but was interviewed by investigators regarding
alleged admissions he claimed the defendant made while housed at the Dauphin County
Prison.  At the time of this testimony, Dykes, who had been charged in a drug related
homicide, was testifying as part of a plea agreement charging him with 18 U.S.C. 924(j)
carrying a ten-year maximum sentence.  The agreement also provided for a downward
departure for substantial assistance.

It is submitted that in the absence of any eyewitness testimony or physical
evidence linking the defendant to the Harrigan homicide, the evidence is insufficient to
establish defendant's involvement by a preponderance of the evidence.  Each witness who
testified as to alleged admissions made by the defendant had something to gain from their
testimony and all but Toyanne Anderson had extensive criminal records.  Even if
testimony from the sources was somehow deemed sufficient to establish defendant's

John K. Vought
September 25, 2002
Page 4


involvement in the killing by a preponderance of the evidence, it must further be
established that the killing was carried out in furtherance of the drug conspiracy. If it was
done for some personal motive or some other disagreement it would not comprise
relevant conduct for purposes of sentencing. It is submitted that there is very little
evidence regarding the reason for the homicide. The evidence which was proffered,
specifically that of Toyanne Anderson, is not sufficient to establish the homicide as one
carried out in furtherance of the drug conspiracy.

Sincerely,

Timothy J. O'Connell

TJO:sf

Harvey Holland # EP8162
S.C.I Dallas
1000 follies Road
Dallas, PA. 18612

office of the Clerk
united States District Court
Middle District of Pennsylvania
u.s. Court house
228 Walnut Street
P.O. Box 983

INMATE MAIL